## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

CARNELL HUNNICUTT, SR.,

     Plaintiff,

v.                                                                No. CV 20-206 MV/CG

DANIEL PETERS, et al.,

     Defendants.

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** is before the Court on Plaintiff Carnell Hunnicutt, Sr.'s *Amended Complaint* (the "Complaint"), (Doc. 3), filed April 2, 2020; *Answers* filed by each of the Defendants (collectively, the "Answers"), (Doc. 19); (Doc. 50); (Doc. 53); (Doc. 104); (Doc. 118); (Doc. 120); Defendant Summit Food Services' *Motion for Summary Judgment* (the "Motion for Summary Judgment"), (Doc. 49), filed August 10, 2021, and the attendant briefing; the *Martinez Report* of Defendants New Mexico Corrections Department ("NMCD") and Southern New Mexico Correctional Facility ("SNMCF"), (Doc. 77), filed October 27, 2021, and the attendant briefing; Mr. Hunnicutt's *Motion for a Temporary Restraining Order and Preliminary Injunction*, (Doc. 21), and his *Memorandum of Law in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction*, (Doc. 22), both filed June 28, 2021, and the attendant briefing; the motions for joinder filed by Prospective Plaintiffs Bobby Beale, (Doc. 29), Erminio Acosta, (Doc. 31), Brett Woolf, (Doc. 38), and Aaron Morrisette, (Doc. 40), and the attendant briefing; and the motions to dismiss filed by Defendants Warden Ronald Martinez, K.D. Miller, Astrid Castillo, Mary Williams, and Joshua Sigala, (Doc. 84); (Doc. 85); (Doc. 87); (Doc. 88); (Doc. 106), and the attendant briefing.

This matter was assigned to the undersigned on March 9, 2020. Thereafter, on June 30, 2021, District Judge Martha Vazquez referred this case to the undersigned to perform legal analysis and recommend an ultimate disposition. (Doc. 25). The Court, having reviewed the filings, the record, and the relevant law, **RECOMMENDS** that Defendant Summit Food Services' Motion for Summary Judgment, (Doc. 49), and the relief requested in SNMCF and NMCD's Martinez Report, (Doc. 77), be **GRANTED**. The Court further **RECOMMENDS** that Mr. Hunnicutt's Complaint, (Doc. 3), be **DISMISSED WITH PREJUDICE** and that the remaining motions be **DENIED AS MOOT**.

## I. Statement of the Facts[1]

Mr. Hunnicutt is currently incarcerated at SNMCF, where he was transferred in 2018. *See* (Doc. 3 at 4); (Doc. 49 at 2). He is Jewish and, at his request, is on the facility's Kosher diet. *Id.* As part of its contract with SNMCF, Defendant Summit Food Services ("Summit") provides on-site preparation and service of the prison meals, including the Kosher meals. (Doc. 49 at 2); (Doc. 56 at 3); (Doc. 61 at 2). This case arises from what Mr. Hunnicutt alleges are deficiencies with the Kosher meals Summit has provided during his time at SNMCF. Mr. Hunnicutt has also brought claims against Defendants NMCD, SNMCF, and various individuals.

### A. The Adequacy of Mr. Hunnicutt's Kosher Meals

Summit provides Kosher breakfast and lunch meals, consisting of "cold and hot cereal, eggs, peanut butter, muffins, cinnamon raisin rolls, carrots, celery, cheese, tuna,

---

[1] The facts as the Court recites them are undisputed by the parties unless otherwise noted, and these facts are recited in a light most favorable to Mr. Hunnicutt as the non-moving party. *See* FED. R. CIV. P. 56; *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 955 (10th Cir. 2005); D.N.M.LR-Civ. 56.1(b) ("All material fact set forth in [the movant's] Memorandum will be deemed undisputed unless specifically controverted.").

and cookies." (Doc. 49 at 3). Summit provides Kosher dinner meals, which are "certified Kosher pre-packaged box dinner entrees prepared by 'My Own Meals[.]'" *Id.* at 6. This Kosher diet provides Mr. Hunnicutt with approximately 2,800 calories daily. (Doc. 3 at 3); (Doc. 61 at 10). According to Mr. Hunnicutt, the meals are often monotonous and contain meat only three days a week, while the general non-Kosher population receives meat in their diet 15 to 18 times a week. (Doc. 3 at 8); (Doc. 49 at 22); (Doc. 77 at 3); (Doc. 101 at 2).

On a number of occasions, particularly while he was placed in segregation, Mr. Hunnicutt received only cold meals. (Doc. 3 at 12); *see also* (Doc. 56 at 4). In explaining this, Defendants NMCD and SNMCF state the meals are normally heated prior to being delivered to segregation, which is a temporary housing unit, because microwaves cannot be provided to a temporary housing unit. (Doc. 77 at 6). There have also been several occasions when Mr. Hunnicutt did not receive any Kosher meal at all, including an incident on August 23, 2018, where he was served "the same pre-packaged meal three days in a row," and was not provided a Kosher menu. (Doc. 3 at 5, 24). A similar incident occurred on February 5, 2019. *Id.*

Further, on a number of occasions, Mr. Hunnicutt has been excluded from certain special accommodations that have been made for non-Kosher inmates. For instance, Mr. Hunnicutt states he and other prisoners receiving religious diets have been excluded from food sales at the commissary as "no kosher or halal foods are made available," and he is therefore unable to "supplement his vegetarian diet with kosher meats." *Id.* at 25.

3

Mr. Hunnicutt has also been excluded from holiday meals, because, according to Mr. Hunnicutt, Defendants "refuse[d] to provide kosher turkey, roast beef, hot dogs, and beef for the religious diets," on holidays. *Id.* at 15. On July 4, 2019, for instance, he and the other prisoners receiving religious diets received their "regular monotonous meal while a special meal was served to those on the general population menu." *Id.* at 17. Other examples include Christmas 2018 and Rosh Hashanah 2019. *Id.* at 15-16, 18. According to Summit, their contract does not require them to provide Kosher meals identical to the holiday menus provided to the general population. (Doc. 61 at 4). Moreover, according to Defendants NMCD and SNMCF, Mr. Hunnicutt did not complete the request-and-approval process before Rosh Hashanah 2019, and Defendants themselves had a "mix-up" concerning Mr. Hunnicutt's meal on Christmas 2018. (Doc. 77 at 7-8, 10-11). However, on Passover in 2021, Mr. Hunnicutt was provided with unleavened corn tortillas instead of bread, and fruit instead of cake, in accordance with his religious observance. (Doc. 49 at 32).

Mr. Hunnicutt has also experienced issues with receiving proper Kosher meals on the Sabbath. (Doc. 56 at 19). On November 9, 2019, for instance, he "attempted to take [his] breakfast tray to consume after sundown in observance of the Sabbath" and was told he had to eat "in the dining hall" or not at all. *Id.* at 20-21. Further, despite the law that prohibits "an observant Jew . . . from working [on the Sabbath], . . . including turning on a stove or microwave[,]" (Doc. 49 at 8), Mr. Hunnicutt has been "serv[ed] pre-cooked foods on the Sabbath that require[] heating." (Doc. 56 at 20). According to Summit, however, Mr. Hunnicutt is served Kosher cold breakfasts and lunches on the

Sabbath, as well as pre-packaged box dinners that may be eaten cold or warm. (Doc. 49 at 8).

**B.** **The Preparation of Mr. Hunnicutt's Kosher Meals**

With regard to the preparation of its Kosher meals, Summit claims it uses a "no-touch diet system" and "[o]nly the trained religious cooks touch the Common Fare meals." (Doc. 49 at 5). The Common Fare Diet "covers Kosher, Halal, Muslim and vegetarian-based religious diets." *Id.* at 27. Summit states "any foods prepared in the kitchen for the Common Fare Diet will utilize cookware and utensils that are stored separately and are washed, rinsed and sanitized separately." *Id.* at 27.

According to Mr. Hunnicutt, however, Summit does not have a "no touch diet system," as this would consist of pre-packaged meals for breakfast, lunch, and dinner, that would require "no cooking of side dishes, no wrapping of foods, [and] no preparing of trays." (Doc. 56 at 9). Rather, according to Mr. Hunnicutt, the only certified Kosher item he receives in a day are the "My Own Meals" dinner entrees, which are served with what he alleges are "inedible . . . and non-kosher" side dishes. *Id.* at 9-10.

Moreover, according to Mr. Hunnicutt, those who prepare the food are not properly-trained religious cooks. There is no culinary arts training program or food service management at SNMCF. (Doc. 3 at 4-5); (Doc. 49 at 27). In fact, Mr. Hunnicutt himself has worked in the SNMCF kitchen "on and off [from] 2018 to the present, and never witnessed training of any kind that resulted in meals being kosher," resulting in "Muslim[] cooks serving Jews meat and dairy in violation of Jewish dietary laws." (Doc. 56 at 4-5). Neither he "nor anyone else was trained to prepare Common Fare Diets nor religious diets[.]" *Id.* at 6.

According to Mr. Hunnicutt, the other cooks "leave the cubby hole where food products are wrapped for Kosher/Halal diets filthy," and he arrives to work in the kitchen "at 3am to find food on the walls, floor, tables and perishables left out overnight from the second shift 'Halal cook.'" *Id.* at 10. Other than himself and one other cook, no other cooks properly wash their dishes. *Id.* at 10. Mr. Hunnicutt has witnessed "only Muslims preparing Kosher/Halal meals," with utensils, equipment and cooking vessels "going from dairy/meats to preparing religious diets." (Doc. 3 at 6). As a result of the lack of culinary arts training, he states he has witnessed Summit "allows non-Jews and non-Muslims [to] prepare meals for the Kosher/Halal diets who had no idea of kashrut[, Jewish dietary law], and . . . serve meat and cheese together to Jews." *Id.* at 23.

According to Summit, they do "provide training to inmates who work in the kitchen as religious cooks on preparing Kosher and Halal meals." (Doc. 49 at 27). The training "follows Jewish Dietary Law . . . which is stricter than other diets." *Id.* The training "includes instructions to keep meat and dairy products separate, to thoroughly clean the inmates' working area and to thoroughly wash all pans and utensils before using them." *Id.* at 27.

Summit does acknowledge that there have been gaps in its service of Kosher food, including, for instance, "incidents where there is a lock-down and the trained religious cooks cannot come to the kitchen," or when one of the religious cooks is absent from work. *Id.* at 5. During those times, another prisoner prepares the meals, but, according to Summit, that substitute cook "will follow the Common Fare Diet procedures and prepare the religious meals in a separate area using separate utensils and cookware." *Id.*

Summit also acknowledges some of the deficiencies alleged by Mr. Hunnicutt, including a kitchen closure in the summer of 2021 that was disruptive to the normal Kosher cooking, as "[f]or security purposes, [Mr. Hunnicutt] and the other trained religious cooks" were not allowed to prepare meals in the smaller remaining kitchen. *Id.* at 7. During this temporary period, Summit was not able to provide separate Kosher utensils, cookware, or storage areas, but stated it trained the other cooks to "prepare religious meals according to the Common Fare Diet policy and procedures" and to "prepare the Kosher and religious meals separately from the non-Common Fare Diet meals." *Id.* at 8. On another occasion, frozen pepperoni pizza was inadvertently purchased "without realizing the pizza had pork[,]" when the facilities are supposed to be "pork-free." *Id.* at 32.

Summit explains that it has "recently ordered new utensils, and the State recently purchased new cookware," which are designated as Kosher. *Id.* at 27, 32. It states that "the State will be providing us with a separate storage area for our Kosher utensils and cookware," and the "religious cooks" already have "their own separate designated area in the kitchen to prepare and cook meals." *Id.* at 28. There is a "trained Muslim inmate who prepares side dishes" to accompany the prepackaged "My Own Meals" dinner entrees. *Id.* at 30. These side dishes are prepared "in a designated area separate from non-Common Fare diets and [the religious cooks] must thoroughly clean the area, the utensils and the pans." *Id.* at 30.

Mr. Hunnicutt proceeded to file prison grievances on the basis of these purported deficiencies. Following that, according to Mr. Hunnicutt, Defendants began "withholding seasonings, vegetables and spices" from the "Kosher/Halal diets as punishment,"

serving "plain white rice, plain macaroni, [and] plain beans straight out of the can." (Doc. 3 at 11). According to Mr. Hunnicutt, he has also been threatened with a retaliatory transfer, and it appears he was indeed transferred out of the facility for several months in 2020. (Doc. 3 at 25); (Doc. 101 at 8).

## II.    Procedural Background

On March 9, 2020, Mr. Hunnicutt commenced this civil rights lawsuit, under 42 U.S.C. § 1983, alleging religious discrimination in violation of the Fourteenth Amendment, as well as religious infringement in violation of the First Amendment, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc, et seq., and the New Mexico Religious Freedom Restoration Act ("NMRFRA"), NMSA § 28-22-3 (2013). *See* (Doc. 1); (Doc. 3); *see also* (Doc. 13 at 1). Mr. Hunnicutt seeks injunctive relief, compensatory damages, and punitive damages. (Doc. 3 at 28-29).

Thereafter, the instant motion practice ensued. Mr. Hunnicutt filed a *Motion for Temporary Restraining Order and Preliminary Injunction* (the "Motion for TRO"), (Doc. 21), on June 28, 2021, following the denial without prejudice by United States District Judge Martha Vazquez of one he had filed earlier in the case. *See* (Doc. 10); (Doc. 13). On August 23, 2021, United States District Judge Martha Vazquez ordered that Mr. Hunnicutt's Motion for TRO be held in abeyance pending the appearance in this case by all Defendants. (Doc. 51); *see also* (Doc. 28). On August 10, 2021, Summit filed a Motion for Summary Judgment, (Doc. 49), which included the "Affidavit and 'Martinez' Investigative Report" of Michael Mays, the Food Services Director for Summit Food Services. (Doc. 49 at 26).

8

On October 27, 2021, Defendants NMCD and SNMCF submitted their own

Martinez Report, (Doc. 77), as previously ordered by the Court, (Doc. 54 at 2). *See*

*Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978). At that time, the Court informed the

parties that this Martinez Report may be used in deciding whether to grant summary

judgment. (Doc. 54 at 5). This PFRD addresses all of the outstanding issues.

## III.     Exhaustion Under the Prison Litigation Reform Act ("PLRA")

Before discussing the merits of Mr. Hunnicutt's claims, the Court will first address

the threshold issue of exhaustion. The PLRA provides that prisoners may not bring a

suit challenging prison conditions without first exhausting available administrative

remedies. 42 U.S.C. § 1997e(a). This exhaustion requirement applies to all suits

brought under federal laws, including § 1983 and RLUIPA. § 1997e(b); *see Chapman v.

Lampert*, 555 F. App'x 758, 761-62 (10th Cir. 2014) (unpublished) (applying the PLRA

to a suit under RLUIPA and § 1983 regarding Kosher diet); *AlAmiin v. Morton*, 528 F.

App'x 838, 842-43 (10th Cir. 2013) (unpublished) (requiring exhaustion of RLUIPA

claims relating to inadequate halal diet). Further, the exhaustion requirement "applies to

all suits about prison life, whether they involve general circumstances or particular

episodes, and whether they allege excessive force or some other wrong." *Porter v.

Nussle*, 534 U.S. 516, 532 (2002). Unexhausted claims must be dismissed with

prejudice. *See McMiller v. Jones*, 590 F. App'x 749, 750 (10th Cir. 2014) (unpublished);

*Gomez v. Lopez*, 581 F. App'x 724 (10th Cir. 2014) (unpublished).

Here, Mr. Hunnicutt has filed at least seven grievances relating to his dietary

complaints, and states he has "exhausted his administrative remedies with respect to all

claims and all Defendants." (Doc. 3 at 26); *see* (Doc. 77 at 4-10). Defendants do not

9

dispute exhaustion of his claims. *See* (Doc. 49); (Doc. 77). The Court therefore finds

that Mr. Hunnicutt has exhausted his claims.

## IV.   Discussion

Turning to the merits of Mr. Hunnicutt's case, particularly Summit's Motion for

Summary Judgment, (Doc. 49), and the Martinez Report by SNMCF and NMCD, (Doc.

77), Defendants ask the Court to grant summary judgment in their favor, and to dismiss

the case in its entirety. *See*, *e.g.*, *Hudson v. Calvillo*, No. 2:16-cv-568 MCA/KRS, 2018

WL 1626262, at *6 (D.N.M. Mar. 30, 2018), *report and recommendation adopted*, 2018

WL 2432900 (D.N.M. May 30, 2018) (granting motions for summary judgment and

dismissal prior to addressing other pretrial motions); *Northington v. Jackson*, 973 F.2d

1518, 1521 (10th Cir.1992) (explaining that *Martinez* Reports may be used on motion

for summary judgment to determine whether pro se prisoner's allegations "have any

factual or legal basis"). Defendants contend that there exist no genuine issues of

material fact as to any of Mr. Hunnicutt's claims, and that on the undisputed material

facts he fails to establish any of his claims. (Doc. 49 at 24). Mr. Hunnicutt argues there

remain issues of material fact, regarding the deficiencies in his Kosher diet, which

preclude summary judgment. (Doc. 56 at 12).

### A.  The Standard for Summary Judgment

The Court shall grant summary judgment only if "the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of

the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). An issue is genuine if evidence exists such that a reasonable jury

could resolve the issue in favor of the nonmoving party. *Id.* The movant bears the burden of making a prima facie demonstration that there is no genuine issue of material fact. *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670–71 (10th Cir.1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the moving party has demonstrated an absence of material fact, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted). The mere existence of some evidence in support of the nonmoving party, however, is insufficient to deny a motion for summary judgment; rather, there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson*, 477 U.S. at 249. The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the Court views in the light most favorable to him. *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir.1995).

The purpose of a *Martinez* Report is to "develop a record sufficient to ascertain whether there are any factual or legal bases for the prisoner's claims." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). "On summary judgment, a Martinez report is treated like an affidavit, and the court is not authorized to accept its fact findings if the prisoner has presented conflicting evidence." *Northington*, 973 F.2d at 1521. A plaintiff's complaint may also be treated as an affidavit if it alleges facts based on the plaintiff's personal knowledge and is sworn under penalty of perjury. *Hall*, 935 F.2d at 1111. A court may not rely on a *Martinez* Report to resolve material disputed facts where it is in conflict with pleadings or affidavits, nor can material factual disputes be resolved based

11

on conflicting affidavits. *Id.* at 1109, 1111. A factual dispute exists even when the plaintiff's factual allegations in conflict with the *Martinez* Report are less specific or well-documented than the factual findings in the *Martinez* Report. *Id.* at 1109.

Finally, the Court must liberally construe a *pro se* litigant's pleadings, including Plaintiff's, and hold them to a less stringent standard than those drafted by an attorney. *See id.* at 1110. However, the Court may not act as a *pro se* litigant's advocate. *Id.* The Court "will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997). In addition, Plaintiff, as a *pro se* litigant, must still follow the same procedural rules governing represented litigants. *Nielson v. Price*, 17 F.3d 1276, 1277 (10th Cir.1994).

### B.    Analysis

Mr. Hunnicutt raises several issues with the Kosher meals provided to him by Defendants. Specifically, he complains that his Kosher meals are often inadequate, monotonous, and cold. *See* (Doc. 3); (Doc. 56). He alleges that his caloric intake on the Kosher diet Defendants serve him is below the purportedly-requisite 3,000 calories daily. (Doc. 3 at 3); (Doc. 56 at 6). He alleges that on several occasions Defendants have altogether failed to provide him Kosher meals, they have violated the Sabbath, they have permitted non-Jewish cooks to prepare his meals, and they have failed to train their cooks on the proper preparation of Kosher meals. *See* (Doc. 3); (Doc. 56). He further alleges Defendants have breached the service contract between Defendants NMCD and Summit, and retaliated against him for filing grievances. (Doc. 83 at 22-23). Mr. Hunnicutt contends, as a result, that Defendants have violated the Equal Protection

Clause of the Fourteenth Amendment, the Free Exercise Clause of the First

Amendment, the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§

2000cc, et seq., the New Mexico Religious Freedom Restoration Act, NMSA § 28-22-3

(2013), and 42 U.S.C. § 1983.

> i.        *Fourteenth Amendment Claim*

Mr. Hunnicutt alleges that Defendants have violated his right to Equal Protection

under the Fourteenth Amendment. (Doc. 3 at 8, 26). Specifically, he alleges that

Defendants provide the non-Kosher prison population with a number of nutritional

options which it refuses to provide to Kosher prisoners, including a greater amount of

meat in their diet, certain holiday meals, and access to more items at the commissary.

*Id.* at 8. Defendants argue that, even if Mr. Hunnicutt has received differential treatment,

he has failed to allege any discriminatory purpose behind such treatment. (Doc. 49 at

12); (Doc. 77 at 11).

For a prisoner to establish an Equal Protection claim on the basis of religion, the

prisoner must demonstrate that he was treated differently from other similarly-situated

prisoners and, that the differential treatment was based on religion, and that the

"difference in treatment was not 'reasonably related to legitimate penological interests.'"

*Fogle v. Pierson*, 435 F.3d 1252, 1261 (10th Cir. 2006) (quoting *Turner v. Safley*, 482

U.S. 78, 89 (1987)); *see also Cullen v. Hatch*, 6:06-cv-341 MV/WPL, 2007 WL 9733619,

at *2 (D.N.M. Aug. 28, 2007), *report and recommendation adopted*, 2007 WL 9729068

(D.N.M. Dec. 5, 2007). "[M]ere negligence or mistake resulting in uneven application of

the law is not an equal protection violation." *Roe v. Keady*, 329 F.3d 1188, 1191-92

(10th Cir. 2003). Rather, to sustain an equal protection claim, a plaintiff "must show a

'discriminatory purpose' leading to disparate treatment." *Roberts v. Champion*, 255 F.Supp.2d 1272, 1290 (D. Okla. 2003) (citing *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979)). "Isolated events adversely affecting an individual are not presumed to be violations of the equal protection clause." *Roberts*, 255 F.Supp.2d at 1290. However, equal treatment under the Fourteenth Amendment does not require precisely identical treatment and resource allocation. *See*, *e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 444 (1985).

Here, Mr. Hunnicutt alleges several facts that amount to differential treatment on the basis of religion. He alleges, for instance, that non-Jewish inmates are provided more hot meals, meat, and holiday meals than he and the other Jewish inmates are provided. *See* (Doc. 3); (Doc. 56). He alleges that those on the religious diet are served cold meals in segregation, despite NMCD's own policy of providing two hot meals per day for the general population, (Doc. 3 at 12), and that those on the religious meal are generally served repetitive cold lunches, (Doc. 56 at 4); (Doc. 83 at 11).

The explanation Defendants offer for the differential treatment is somewhat lacking. They admit a negligent and uneven application of the prison's policies regarding his Kosher diet, during a time period that included pandemic-related lockdowns for the prison. *See*, *e.g.*, (Doc. 49 at 17). They do not, however, proffer any facts regarding the impact of the pandemic-related lockdowns on non-Kosher inmates. Defendants state that many of the incidents of which Mr. Hunnicutt complains resulted from operational constraints, such as the length of time it takes for an officer to carry his food to segregation, or the requirements of the prison's affordable Halal and Kosher diets. *See* (Doc. 49 at 8); (Doc. 77 at 6). Again, Defendants fail to explain whether these

14

constraints similarly affected non-Kosher inmates, and if not, why not. (Doc. 49 at 15, 17); (Doc. 77 at 6).

Nevertheless, Defendants correctly argue that Mr. Hunnicutt has alleged no facts evincing any discriminatory intent on the part of Defendants. (Doc. 49 at 17-18). This is an indispensable element of an Equal Protection claim, which Mr. Hunnicutt must establish before the burden shifts to Defendants for an explanation of the differential treatment. *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1230 (D.N.M. 2015) ("If the plaintiff can produce evidence of discriminatory purpose, then the burden shifts to the government to prove that it would have taken the same action without the discriminatory motivation."); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270 (1977). Mr. Hunnicutt has failed to offer any such facts. *See, e.g., Bautista v. Nevada Dep't of Corr.*, No. 3:18-cv-194 MMD/WGC, 2021 WL 825990, at *8 (D. Nev. Mar. 4, 2021) (finding no equal protection claim where plaintiff failed to produce evidence of intent to discriminate). Mr. Hunnicutt does not allege, for instance, that Defendants have made antisemitic statements, or any other evidence indicating that Defendants are motivated by animus as opposed to legitimate penological interests such as cost savings and security. *Cf. Ashaheed v. Currington*, 7 F.4th 1236, 1244 (10th Cir. 2021) (threats plus refusal to grant Muslim inmate a religious exemption to shaving, along with differential treatment of non-Muslims, may allow inference of discriminatory intent). While Mr. Hunnicutt's frustration with the uneven meal service is understandable, his allegations do not rise above the type of "mere negligence or mistake resulting in uneven application of the law" which the Tenth Circuit has found inadequate to show an Equal Protection violations. *Roe*, 329 F.3d at 1191-92; *see also*

*Bautista*, 2021 WL 825990, at *7 (finding no equal protection claim where Common Fare meals were served cold and largely vegetarian).

The Court therefore finds there exist no genuine issues of material fact that Defendants violated Mr. Hunnicutt's Equal Protection rights regarding his Kosher diet. Accordingly, the Court will recommend Mr. Hunnicutt's Equal Protection claim be dismissed with prejudice.

        ii.        *First Amendment,* Religious Land Use and Institutionalized Persons Act, *and* New Mexico Religious Freedom Restoration Act *Claims*

Next, the Court will consider Mr. Hunnicutt's claims under the First Amendment, RLUIPA, and NMRFRA together. *See Gonzalez v. Joey*, 1:12-cv-834 RB/GBW, 2016 WL 10587952, at *8 (D.N.M. Mar. 2, 2016) (applying the same analysis to claims under the First Amendment as claims under RLUIPA), *report and recommendation adopted*, 2016 WL 10587953 (D.N.M. Mar. 25, 2016). Mr. Hunnicutt alleges that Defendants have infringed his rights under the First Amendment, RLUIPA, and NMRFRA, in that the Defendants' conduct placed a substantial burden on his ability to practice his religion. (Doc. 56 at 1-2); (Doc. 3 at 1, 26). In support, Mr. Hunnicutt points to the purportedly low caloric intake he receives simply because he chooses to eat Kosher, the problems with food preparation and service, which leaves him with inadequate food as a result of his choice to eat Kosher, and the preparation of his food by non-Jews, which affects his adherence to Bishul Yisrael.[2] *See* (Doc. 56); (Doc. 49 at 53).

---

[2] Under Bishul Yisrael, certain foods are prohibited if they are cooked "exclusively by non-Jews." (Doc. 49 at 53). Summit argues that this prohibition only applies to dishes that are "fit for a king's table" and "not generally eaten raw." *Id.* Summit also admits, however, that "[d]ifferent rabbis have different views on the absolute minimum" Jewish participation in the cooking process that may "suffice to keep the food kosher." *Id.*

16

Summit argues that Mr. Hunnicutt has failed to demonstrate that it substantially burdened his religious exercise of following a Kosher diet, and asks that the Court therefore dismiss this claim. (Doc. 49 at 13, 24). Defendants SNMCF and NMCD allege that Mr. Hunnicutt "has not been burdened or restricted in the free exercise of his religion," and similarly ask the Court to dismiss his claim. (Doc. 77 at 14-15). Defendants further argue, with regard to RLUIPA, that while the statute imposes a "compelling governmental interest" standard, it "does not elevate accommodation of religious observances over an institution's need to maintain order and safety." (Doc. 49 at 10).

The Free Exercise Clause of the First Amendment requires government "respect for, and noninterference with, the religious beliefs and practices" of the people. *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). In order to allege a constitutional violation based on the Free Exercise Clause, a prisoner must allege that a prison regulation substantially burdened his sincerely-held religious beliefs. *Williams v. Wilkinson*, 645 F. App'x 692, 704 (10th Cir. 2016) (citing *Kay v. Bemis,* 500 F.3d 1214, 1218 (10th Cir. 2007)). Next, the government may rebut by identifying "legitimate penological interests that justified the impinging conduct," and the court must apply a balancing test to determine the reasonableness of the regulation. *Id.*

In *Turner v. Safley*, 482 U.S. 78, 89 (1987), the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." The Supreme Court explained that "several factors are relevant in determining the reasonableness of the regulation at issue," including: 1) whether the governmental interest is legitimate, neutral, and

17

rationally connected to the regulation; 2) whether alternative means exist to exercise the infringed right; 3) the impact of accommodating the infringed right will have on guards, other inmates, and prison resources in general; and 4) whether obvious, easy alternatives to the regulation exist. *Id.* at 89-91. The Supreme Court specified that the last factor is not a "least restrictive alternative" test: "prison officials do not have to set up and shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at 90-91. However, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91.

It is well-settled that all inmates, including Mr. Hunnicutt, have First Amendment interests in diets conforming to their religious beliefs. *See Abdulhaseeb v. Calbone*, 600 F.3d 1301 (10th Cir. 2010) (discussing halal diet under RLUIPA); *Beerheide v. Suthers*, 286 F.3d 1179 (10th Cir. 2002) (discussing kosher diet under the First Amendment/ *Turner*). However, whether or not Mr. Hunnicutt's meal plan violates the First Amendment depends on the extent to which Defendants accommodate his beliefs and his proposed alternative. *Compare Ashelman v. Wawrzaszek*, 111 F.3d 674 (9th Cir. 1997) (holding prison policy unreasonable where plaintiff suggested less costly alternative to three prepackaged meals a day), *with Andreola v. Wisconsin*, 211 F. App'x 495, 496 (7th Cir. 2006) (unpublished) (holding RLUIPA did not require prison to spend $2,000 per year providing plaintiff with certified Kosher meals). "[S]poradic service of inedible religious meals does not rise to the level of a substantial burden." *Blair v. Raemisch*, 804 F. App'x 909, 919 (10th Cir. 2020).

Finally, as stated above, courts consider Free Exercise claims along with claims under RLUIPA, because "[t]he required preliminary showing under RLUIPA is identical to that of the free exercise clause: that the restriction substantially burdened Plaintiff's sincerely held religious beliefs." *Gonzalez*, 2016 WL 10587952, at *8. That is, RLUIPA prohibits the government from imposing a substantial burden on an inmate's religious exercise unless the government demonstrates the imposition of the burden is "in furtherance of a compelling government interest[,]" and "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C.A. §§ 2000cc-1(a)(1)-(2). Similarly, NMRFRA "prohibits a government agency from restricting a person's free exercise of religion unless the restriction is one of general applicability, does not directly discriminate against religion, is essential to furthering a compelling government interest, and its application is the least restrictive means of furthering that interest." *State ex rel. Peterson v. Aramark Corr. Servs. LLC*, 321 P.3d 128, 138 (N.M. App. 2014).

### 1. Nutritional Adequacy

Here, first, Mr. Hunnicutt alleges that the Kosher diet he receives is nutritionally inadequate because it gives him fewer than 3,000 calories of food per day, and because side dishes are periodically missing from his meals, unappetizing, or cooked in a dish used to cook non-Kosher food. (Doc. 3 at 3, 24). In other words, as the Court understands it, Mr. Hunnicutt is arguing that the Kosher diet provided by Defendants requires him to choose between practicing his religion and a healthy diet. (Doc. 56 at 20). Indeed, Defendants have provided "Summit's Nutritional Compliance Statement," a "NetMenu Average Cycle Nutrition Analysis by Diet for Summit: Corrections," documentation of the Common Fare Diet and My Own Meals, a Halal Diet five-week

menu for 2021, and an affidavit by SNMCF Food Services Director Mr. Mays, all of which show that the Kosher meals plan provides Mr. Hunnicutt with an average of 2,800 calories per day. (Doc. 49 at 26-52).

Courts in this Circuit have considered such allegations of inadequate nutrition, and have found similar calorie amounts to be sufficient. *See*, *e.g.*, *Murnahan v. Daily*, No. 89-3285-S, 1990 WL 203139, at *3 (D. Kan. Nov. 28, 1990) (finding no constitutional violation where prisoner received 2,500 calories per day). To state a claim of food deprivation as a violation of the Free Exercise Clause and RLUIPA, a prisoner must allege a "serious deprivation of the minimal civilized measure of life's necessities[.]" *Strope v. Cummings*, 381 F. App'x 878, 880 (10th Cir. 2010) (internal quotations omitted); *see*, *e.g.*, *Hutto v. Finney*, 437 U.S. 678 (1978) (finding a constitutional violation where prisoners were subjected to a long-term diet of fewer than 1,000 calories a day). Mr. Hunnicutt receives approximately 2,800 calories daily, which, given the case law, the Court finds is sufficient.

The Court further finds that Mr. Hunnicutt's allegations of occasional lapses in food service, periodically missing side dishes, and isolated incidents of undercooking to the point of causing illness do not constitute serious food deprivation. *See*, *e.g.*, *Wishneski v. Dona Ana Cty.*, 2: 08-cv-348 MCA/WPL, 2009 WL 10708582, at *4 (D.N.M. Feb. 19, 2009), *report and recommendation adopted as modified*, 2009 WL 10708217 (D.N.M. May 7, 2009) (finding no constitutional violation where plaintiff alleged "numerous cases of food poisoning"); *Blair*, 804 F. App'x at 909 ("[S]poradic service of inedible religious meals does not rise to the level of a substantial burden."); *Beauchaine v. Winder*, No. 2:07-CV-657 TS, 2009 WL 3064697, at *9 (D. Utah Sept.

22, 2009) (declining to find inadequate nutrition where prisoner alleged his food tray was missing items on a daily basis).

### 2.  Monotonous, Cold Vegetarian Diet

Next, Mr. Hunnicutt complains that his food is served cold, and that his menu is monotonous. In particular, he alleges that once the food service was taken over by Summit and its assistant director of food services Astrid Castillo, "the menu went to a vegetarian diet with a repetitive cycle of peanut butter, beans[,] cheese and rice with meatless entrees."(Doc. 3 at 4). Defendants do not dispute these allegations. (Doc. 49 at 21).

The Tenth Circuit has found in a similar case that, where "kosher meals were less varied than the regular meals, had [less] seasonal fruits and vegetables, included . . . even rotten items on occasion, and entirely lacked certain items found on the regular menu[,]" that prisoner's First Amendment rights to exercise his religion were not substantially burdened. *Strope*, 381 F. App'x at 880; *see also Carroll v. Newton*, 6:00-cv-99 MV/KBM, 2002 WL 35650178, at *4 (D.N.M. Feb. 19, 2002), *subsequently aff'd*, 44 F. App'x 455 (10th Cir. 2002) ("food that sometimes contains foreign objects or is served cold does not amount to a constitutional deprivation"); *Wishneski,* 2009 WL 10708582, at *4 (finding no constitutional violation where menu was on a monotonous, 2-3 week menu rotation). Similarly, Mr. Hunnicutt's allegations regarding cold, monotonous meals do not constitute a substantial burden on his religious exercise.

### 3.  Violations of the Kosher Diet

Mr. Hunnicutt further complains that the meals Defendants provide prevent him from adhering to Bishul Yisrael, under which certain foods are prohibited if they are

cooked "exclusively by non-Jews." *See* (Doc. 49 at 53). Mr. Hunnicutt adheres to Bishul Yisrael, and thus requests that "[t]o ensure a Kosher diet at SNMCF, the Defendants need to implement a [no touch diet system] that requires no wrapping of food items/no cooking of side dishes because all meals and meats are pre-packaged 'TV-style' provided by kosher vendors and double sealed in plastic wrap that can be heated in standard ovens and microwaves." (Doc. 56 at 20). He asserts that anything less would be considered "pagan cooking," or unkosher. *Id.* This concern apparently relates to Mr. Hunnicutt's complaints about Defendants' alleged failure to provide a separate Kosher food preparation space, inadequately trained cooks, and violations of the Sabbath.

This Court has previously handled a similar claim, where a Muslim inmate was receiving only one prepackaged halal meal per day, and he requested "that all his food be prepackaged or that a Muslim prepare his food." *Wilson v. Gonzales*, 1:16-cv-604 MCA/CG, 2018 WL 2090686, at *5 (D.N.M. May 4, 2018), *report and recommendation adopted*, 2018 WL 2432897 (D.N.M. May 30, 2018). In that case, the defendants conceded "for the sake of argument" that at least "[u]nder the more exacting RLUIPA standard," the plaintiff's religious exercise was substantially burdened. *Id.* at 8. However, Defendants alleged that providing the plaintiff with all prepackaged meals would be "prohibitively expensive." *Id.* at 9. The Court found that denying the plaintiff's request for all prepackaged meals was "both reasonably related to legitimate penological goals and . . . the least restrictive means of meeting a compelling interest," where the prison provided an "otherwise approved halal diet." *Id.*

With regard to the no-touch, prepackaging diet system Mr. Hunnicutt requests as part of his adherence to Bishul Yisrael, Defendants failure to accommodate this

constitutes a burden on Mr. Hunnicutt's religious exercise—perhaps even a substantial one. However, here, as in *Wilson v. Gonzales*, the burden is justified by the legitimate and compelling interest Defendants have of not incurring prohibitively high expenses in accommodating this request. *Wilson*, 2018 WL 2090686, at *5; *see also*, *e.g.*, *Andreola*, 211 F. App'x at 499; *Dean v. Corrections Corporation of America*, 108 F. Supp. 3d 702, 716-17 (D. Ariz. 2014) (finding compelling interest and least restrictive means met where prepackaged meals cost over $8,000 annually); *Kahane v. Carlson*, 527 F.2d 492, 496 (2nd Cir. 1975) (declining to require prepackaged Kosher meals under First Amendment analysis where there were other feasible alternatives).

Mr. Hunnicutt has not provided evidence of a less restrictive alternative or more feasible means of accommodating his beliefs, other than the standard Kosher diet he is currently receiving. *Compare Ashelman*, 111 F.3d 674 (holding prison policy unreasonable where plaintiff suggested less costly alternative to three prepackaged meals a day), *with Andreola*, 211 F. App'x at 496 (unpublished) (holding RLUIPA did not require prison to spend $2,000 per year providing plaintiff with certified Kosher meals). Accordingly, the Court finds that Defendants' denial of Mr. Hunnicutt's request for all prepackaged meals, while providing an otherwise approved Kosher diet, is both reasonably related to legitimate penological goals and is the least restrictive means of meeting a compelling interest. *See Wilson*, 1:16-cv-604 MCA/CG, 2018 WL 2090686, at *9; *Dean*, 108 F. Supp. 3d at 716-17; *Kahane*, 527 F.2d at 496.

Similarly, with regard to Mr. Hunnicutt's complaints about the kitchen, the cost issues and prison operational constraints of requiring Defendants to provide an all-Jewish kitchen staff or a separate Kosher kitchen would be impractical. *See Wilson*,

1:16-cv-604 MCA/CG, 2018 WL 2090686, at *10. Again, Mr. Hunnicutt offers no other less restrictive alternative that would obviate the prison's practical concerns. The Court therefore finds that any failure to provide perfectly separate space, utensils and cookware does not represent a violation of the First Amendment, RLUIPA or NMRFRA.

Mr. Hunnicutt alleges incidental violations of his Kosher diet resulting in receiving meat and cheese together, which the Court finds do not constitute a substantial burden of his religious exercise. *See Gallagher v. Shelton*, 587 F.3d 1063, 1070 (10th Cir. 2009) (finding "isolated acts of negligence" insufficient to substantially burden prisoner's free exercise); *Strope*, 381 F. App'x at 881 (10th Cir. 2010) ("scattered and minor complaints about kosher meals" insufficient to show substantial burden).

Mr. Hunnicutt alleges exclusion from non-Jewish holidays, but such complaints are facially unrelated to his exercise of religion since he observes Jewish holidays, not non-Jewish ones. (Doc. 3 at 15). Mr. Hunnicutt also alleges a failure to provide Jewish holiday meals, but that failure falls on Mr. Hunnicutt who did not properly request such meals despite instruction from the prison on how to do so. *See* (Doc. 77 at 10-11). Relatedly, the Court finds that a simple two-step process for requesting holiday meals does not represent a substantial burden on Mr. Hunnicutt's religious exercise. *See Wares v. Simmons*, 392 F.3d 1141, 1143 (10th Cir. 2004) ("The First Amendment does not preclude prisons from restricting inmates' religious practices, so long as prison authorities afford prisoners reasonable opportunities to exercise their sincerely held religious beliefs.") (internal quotation omitted).

Mr. Hunnicutt alleges he is unable to purchase Kosher items which contain meat from the commissary. (Doc. 3 at 25). However, he admits to receiving meat several

times a week, apparently in addition to the tuna he often receives for lunch, and he

appears to be receiving an overall nutritionally sufficient diet. (Doc. 3 at 7-8); (Doc. 49 at

46-52).The Court thus finds that this does not represent a substantial burden on his

religious exercise. *Bautista*, 2021 WL 825990, at *6 (finding inadequate amounts of

meat not a substantial burden of religious exercise).

With regard to Mr. Hunnicutt's allegation that the prison has failed to train its

religious cooks, the parties agree that there are two trained religious cooks, Mr.

Hunnicutt and Mr. Beale, who prepare meals for the 23 Kosher inmates. (Doc. 49 at 6-

7); (Doc. 56 at 10). Courts have found that only one trained Kosher cook for an entire

Kosher prison population was adequate. *See*, *e.g.*, *Cottriel v. Jones*, 588 F. App'x 753

(10th Cir. 2014). The Court therefore finds that any failure to affirmatively train religious

cooks, beyond the two existing religious cooks, does not represent a substantial burden

on Mr. Hunnicutt's religious exercise at this time.

### 4. *Violations of the Sabbath*

Mr. Hunnicutt also complains that Defendants serve him cooked or reheated food

on the Sabbath, which violates the Sabbath, because "observant Jews may not eat

foods that are cooked on the Sabbath, or even reheated by Jews on the Sabbath."

(Doc. 56 at 20). Mr. Hunnicutt complains Defendants prohibited him from taking his food

tray to his cell to consume after sundown on the Sabbath, telling him that he could eat in

the dining hall or not at all. *Id.* at 20-21. Summit does not dispute Mr. Hunnicutt's factual

allegations, but rather challenges his understanding of the Sabbath. (Doc. 49 at 80).

Mr. Hunnicutt does not allege he is deprived of food on the Sabbath—merely that

he is served meals at the wrong time of day for him to eat pursuant to his religious

observance, as he typically fasts during daylight hours. (Doc. 56 at 11-12); (Doc. 3 at 20-23). Such a decision on his own part, combined with a desire to then eat after sunset in his cell, does not outweigh the prison's legitimate penological goal of ensuring safety for its inmates, for example by preventing prisoners from using food trays to smuggle prohibited items. (Doc. 49 at 5). The Court finds that Defendants' actions with regard to the Sabbath do not represent a substantial burden on his religious exercise.

### 5. Violations of Summit's Food Services Contract

Mr. Hunnicutt also claims various violations of the food service contract between Summit and SNMCF. *See*, *e.g.*, (Doc. 56 at 7-8). However, violations of a contract to which he is not a party do not give rise to a cause of action. *See Dill v. Am. Home Mortg. Servicing, Inc.*, 935 F. Supp. 2d 299, 302 (D. Mass. 2013) ("To bring a claim for breach of contract, a litigant must be a party to or intended beneficiary of the contract."); *Klamath Water Users Protective Ass'n v. Patterson,* 204 F.3d 1206, 1211 (9th Cir. 1999), *opinion amended on denial of reh'g*, 203 F.3d 1175 (9th Cir. 2000) ("Parties that benefit from a government contract are generally assumed to be incidental beneficiaries, and may not enforce the contract absent a clear intent to the contrary."). More importantly, breach of contract claims are unrelated to Mr. Hunnicutt's Free Exercise rights. His breach of contract claim is thus without merit.

### 6. Retaliatory Transfer

Mr. Hunnicutt claims in his Amended Complaint that, shortly after he initiated this case, Defendants notified him that he would be transferred to another facility, which he believed was motived by a desire to moot his requests for injunctive relief. (Doc. 3 at 25-26). Mr. Hunnicutt was transferred to Northeast New Mexico Detention Facility in or

around April 2020, and then returned to his current facility in July of 2020. (Doc. 83 at 67, 83); (Doc. 6); (Doc. 9).

"While a prisoner enjoys no constitutional right to remain in a particular institution and generally is not entitled to due process protections prior to such a transfer, prison officials do not have the discretion to punish an inmate for exercising his first amendment rights by transferring him to a different institution." *Frazier v. Dubois*, 922 F.2d 560, 561–62 (10th Cir. 1990) (quoting *Murphy v. Missouri Dep't of Correction*, 769 F.2d 502, 503 (8th Cir. 1985)).

Mr. Hunnicutt offers no facts evincing any kind of retaliatory motive aside from the temporal proximity. Indeed, the transfer appears to have taken place mere weeks after he commenced this case. *See* (Doc. 1); (Doc. 83 at 67). However, an exhibit produced by Mr. Hunnicutt Hu states that he was temporarily transferred due to "facility needs." (Doc. 83 at 67). Moreover, the temporary transfer did not moot his claims for injunctive relief in this action.

Absent any further rebuttal by Mr. Hunnicutt to the stated reason of "facility needs," he fails to establish a claim of retaliation. *See* (Doc. 3 at 25-26); *see also Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) (allegations of retaliation fail because prisoner "presented no evidence that the defendants' alleged retaliatory motives were the 'but for' cause of the defendants' actions."). The Court therefore finds there exist no genuine issues of material fact that Defendants violated Mr. Hunnicutt's First Amendment rights regarding his three-month transfer out of the facility.

The Court therefore finds, in sum, that there exist no genuine issues of material fact that Defendants violated Mr. Hunnicutt's rights under the First Amendment,

RLUIPA, or NMRFRA. Accordingly, the Court will recommend that these claims be dismissed with prejudice.

### iii. 42 U.S.C. § 1983 Claims

Finally, Mr. Hunnicutt alleges a separate cause of action against Defendants under 42 U.S.C. § 1983 for violating his constitutional rights. (Doc. 3 at 1); (Doc. 56 at 1). However, "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (internal quotation marks omitted).

The claims Mr. Hunnicutt has brought pursuant to § 1983—violations of his Fourteenth Amendment Rights, First Amendment Rights, RLUIPA and NMRFRA—have been addressed above. There is no separate § 1983 claim to analyze. As discussed above, Mr. Hunnicutt has failed to adequately allege deprivation of a federal right. The Court there recommends his § 1983 claim be dismissed with prejudice. *Id.*

## V.    Conclusion

For the foregoing reasons, the Court finds that Defendants are entitled to summary judgment. As a result, the Court further finds the remaining motions are moot. *See Hudson,* 2018 WL 1626262, at *6.

The Court therefore **RECOMMENDS** that Defendant Summit Food Services' *Motion for Summary Judgment*, (Doc. 49), and the relief requested in SNMCF and NMCD's Martinez Report, (Doc. 77), be **GRANTED**.

The Court **FURTHER RECOMMENDS** that Mr. Hunnicutt's Complaint, (Doc. 3), be **DISMISSED WITH PREJUDICE**.

The Court **FINALLY RECOMMENDS** that Mr. Hunnicutt's *Motion for a Temporary Restraining Order and Preliminary Injunction*, (Doc. 21), Prospective Plaintiff Bobby Beale's *Motion for Joinder of Plaintiff's Complaint*, (Doc. 26), Prospective Plaintiff Erminio Acosta's *Motion for Joinder of Plaintiff's Complaint*, (Doc. 31), Prospective Plaintiff Brett Woolf's *Motion for Joinder of Plaintiff's Complaint*, (Doc. 38), Prospective Plaintiff Aaron Morrisette's *Motion for Joinder of Plaintiff's Complaint*, (Doc. 40), Defendant Warden Ronald Martinez's *Motion to Dismiss and Memorandum in Support*, (Doc. 84), Defendant K.D. Miller's *Motion to Dismiss and Memorandum in Support*, (Doc. 85), Defendant Astrid Castillo's *Motion to Dismiss*, (Doc. 87), Defendant Mary Williams' *Motion to Dismiss*, (Doc. 88), and Defendant Joshua Sigala's *Motion to Dismiss and Memorandum in Support*, (Doc. 106), be **DENIED AS MOOT**.

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

_____
THE HONORABLE CARMEN E. GARZA
CHIEF UNITED STATES MAGISTRATE JUDGE